2020 IL App (2d) 180529-U
No. 2-18-0529
Order filed February 20, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CM-2160 |
| ALEJANDRO HERNANDEZ-CRUZ, | ) ) ) | Honorable William J. Parkhurst, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The State proved defendant guilty beyond a reasonable doubt of domestic battery and the trial court was not mistaken about the prosecution's burden of proof; the court's isolated posttrial comment that it "could very likely be wrong," effectively was an invitation for defendant to file appeal, as the court consistently restated its finding that the victim was credible and defendant was not credible.

¶ 2    Following a bench trial, defendant, Alejandro Hernandez-Cruz, was convicted of two counts of domestic battery (720 ILCS 5/12-3.2(a) (West 2016)) and sentenced to 12 months' probation. He timely appeals, arguing that he was not proved guilty beyond a reasonable doubt, as

the court conceded at the hearing on the posttrial motion that "[it] could very likely be wrong." We determine that defendant was proved guilty beyond a reasonable doubt. Thus, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant and Zulema Mojica, who both testified at trial with the help of a Spanish interpreter, met in January or February 2017. They began dating, and in March or April 2017, Mojica and her two daughters and son moved into defendant's apartment. Defendant worked while Mojica stayed home with her children.

¶ 5      Very early on July 28, 2017, defendant left the apartment to go to work. He later texted Mojica that he loved her. According to Mojica, defendant's attitude toward her changed later in the day when she told defendant that she had been talking to the father of one of her daughters. Although defendant never indicated that this made him angry, he agreed that "[s]he was talking to other people," and he testified that Mojica was "just using [him]."

¶ 6      When defendant returned home around 4 or 4:30 p.m., he told Mojica and the kids that he was going to sleep in his bedroom, and he asked them not to bother him. Although Mojica believed defendant appeared frustrated, defendant stated that he was not. In fact, he testified that, when he got home, he asked Mojica whether she and the children were well, and he played with the kids for a bit before heading to the bedroom to sleep.

¶ 7      Three to five hours later, Mojica, who had decided that she needed to leave defendant, went into the bedroom, which was dark. She did not believe that defendant was asleep. She stated that, while touching defendant's shoulder, she asked defendant if they could talk. Defendant, who claimed that Mojica violently shook him and used a loud voice, did not answer her. Mojica asked two more times. Defendant, who was upset, eventually rolled over and told Mojica that they had

nothing to discuss. Mojica replied, " 'okay' " and then turned on a bedside lamp so that she could see to pack up her things.

¶ 8 According to Mojica, defendant, who was angry at her for turning on the light, yelled at her to turn off the light. Defendant denied ever yelling. Mojica stated that, when she did not turn off the light, defendant threw the lamp at her. She ducked, and the lamp hit the wall. Defendant denied throwing the lamp, claiming instead that he turned off the lamp and grabbed it to prevent Mojica from turning it on again. Defendant further asserted that Mojica, who was very angry and yelling nasty things at him, threw the lamp at the wall.

¶ 9 When Mojica's daughters heard the lamp hit the wall, they came into the bedroom. Mojica stated that both she and her daughters were scared.

¶ 10 According to Mojica, she pleaded with defendant to let her leave, but defendant covered her mouth to prevent her from talking and yelled at her to " 'shut up.' " Mojica tried to pull defendant's hand away from her mouth, but she could not do so, as defendant was "very strong." Mojica stated that defendant had hurt her when he put his hand over her mouth, but she freed herself from defendant's grasp. She and her daughters walked toward the kitchen while defendant pulled on Mojica's arms. Mojica was very scared, because defendant had a "strong personality."

¶ 11 Mojica indicated that, while in the kitchen with defendant and her daughters, defendant pushed Mojica against the refrigerator and used his right hand to cover the bottom of Mojica's mouth, her chin, and the top of her neck. Defendant denied this, but admitted that he grabbed Mojica's hands and arms. He claimed to be trying to prevent Mojica from hitting him or grabbing a knife to harm him.

¶ 12 Defendant then went back into the bedroom, and Mojica followed him, telling her daughters to call 911 if they heard any more noises.

¶ 13    In the bedroom, Mojica again told defendant that their relationship was over. Once defendant confirmed that Mojica wanted to leave him, he told her to " '[g]et out of here.' "

¶ 14    Mojica called her son's father and asked him to come get the kids. He did, and Mojica packed her things while defendant yelled insults at her. Defendant claimed that Mojica was yelling insults at him and throwing things around the room while he remained calm.

¶ 15    When Mojica finished packing, a family member came to get her. Mojica called Santos Diaz, a friend who was a police officer, and told him what had happened. The next day, he accompanied her to the police station, where she gave the police a written statement.

¶ 16    The trial court found defendant guilty. In doing so, the court stated:

"But I have a moral certainty that the State has proven by a—beyond a reasonable doubt that this is domestic violence both of an insulting or provoking nature and also physical harm.

And let me tell you why. I completely agree with [defendant] that waking someone up out of a sound sleep is very unpleasant and it might feel like torture.

And I have evaluated the credibility of the witnesses. And as to what happened in the bedroom, if that was all that happened in this case, I might feel differently about this.

But there is a whole second story to this, a second chapter.

*** [Mojica] was out in the kitchen with the kids. And [defendant] joined them.

It is highly unlikely that he was going out there to, you know, make food for the kids or try to patch up the relationship. I think that the victim's testimony is very believable that he came out there or he took her out there by pushing and shoving, grabbing her, continuing the physical confrontation.

He may have been provoked, but it does not excuse what happened in the kitchen. He had a choice. He could have packed up his bags, for instance, is one choice and said, 'I need to live in an environment where people let me sleep.'

He could have taken a walk around the block to cool himself off. He is responsible for his own anger.

So as for what happened in the bedroom, I don't know if in my mind that would raise [*sic*] to the level of being a criminal act or domestic violence because she certainly did start by trying to wake him up. And I—really, I believe [defendant's] testimony that she was turning the light on and he was turning it off.

\*\*\*

There is no legal excuse for what [defendant] did out in the kitchen. And I believe her and not him for that.

\*\*\* [Defendant] grabbed her. Put his hand over her mouth and, unfortunately, that happened to happen in front of the kids."

¶ 17    The case immediately proceeded to sentencing. The trial court noted that it "didn't disbelieve everything [defendant] said" at trial. For instance, the court believed that defendant had feelings for Mojica and cared about her children. However, the court also stated:

"I don't think you were the victim here. When you are in a relationship, sometimes one person is going to want to talk when you are going to want to sleep. And you can't roughhouse them. That is absolutely not allowed.

You can't lay your hands on someone in anger. It is not allowed.

It doesn't matter what bad names they call you. It doesn't matter how inconsiderate they were to you if you were hungry or tired. You just can't do it.

You have to learn the techniques of calming yourself. You have to learn that you are responsible for your own anger."

¶ 18    Defendant filed a posttrial motion, arguing that he was not proved guilty beyond a reasonable doubt. The court denied the motion, but noted that defendant was a hard-working man who needed his sleep. The court continued:

"So I really was very sympathetic to you. Unfortunately I didn't believe your testimony and I believed the victim's testimony. I didn't like the fact she was waking you up and saying we got to talk about it tonight. She should have left you alone and given you a good night's sleep. Probably not the right woman for you. I'm really sorry this is going to cause problems with your employment and immigration status. But I believe her.

She said you're the violent one in the bedroom. You were clearly the violent one in the kitchen. You had your hand on either her throat or her chest or I thought her face when you're in the kitchen pushing her up against the refrigerator. I just didn't buy it. Your testimony, I didn't believe. I believed her testimony.

*I could very likely be wrong*. There's an appeal process for you. But in my mind I'm not wrong. Obviously[,] I wasn't there. But I thought her testimony was very consistent. I thought her demeanor on the stand was very believable. And I just didn't buy into the way you said things happened, either in the bedroom or certainly in the kitchen.

That made no sense to me why you would follow someone in a volatile situation into another room and then press them up against the refrigerator—it made no sense to me. That sounded to me like you continued to be the aggressor in the case. *** I just didn't buy your testimony." (Emphasis added.)

¶ 19                          II. ANALYSIS

¶ 20     At issue in this appeal is whether defendant was proved guilty beyond a reasonable doubt of domestic battery. A person commits domestic battery if he "knowingly without legal justification by any means: (1) [c]auses bodily harm to any family or household member; [or] (2) [m]akes physical contact of an insulting or provoking nature with any family or household member." *Id.*

¶ 21     We review claims of insufficient evidence to determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Id.* It is not the function of this court to retry the defendant. *Id.* Rather, the trier of fact must assess the credibility of the witnesses and the weight of their testimony, resolve conflicts in the evidence, and draw reasonable inferences from that evidence, and this court will not substitute its judgment for that of the trier of fact on these matters. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001).

¶ 22     Here, viewing the evidence in the light most favorable to the State, we determine that the evidence was sufficient to prove defendant guilty of domestic battery beyond a reasonable doubt. The evidence revealed that defendant and Mojica were in a relationship. On the night of the incident, the couple had lived together for several months, so defendant does not dispute that she was a household member. Defendant was upset because Mojica had been talking with another man, thus making him feel that Mojica was using him. After fighting with Mojica in the bedroom, yelling at her, and hurting her when he covered her mouth with his hand, he followed her into the kitchen, grabbing her as she walked. While in the kitchen, he pushed her against the refrigerator.

Mojica asserted that she was scared by defendant's actions. Defendant, whom Mojica described as very strong, used his hand to cover the lower portion of Mojica's face and her neck.

¶ 23    Defendant argues that "[w]e do not need to speculate on whether there was reasonable doubt because the trial court conceded that [it] had reasonable doubts about *** [d]efendant's guilt." In making this argument, defendant relies on the fact that, in denying defendant's posttrial motion, the court noted that "[it] could very likely be wrong." We conclude that this isolated comment does not amount to reasonable doubt.

¶ 24    Defendant takes the comment out of context, failing to consider the entirety of what the trial court said. When we consider the entire record, we simply cannot reverse defendant's conviction based on this isolated comment. *People v. Weston*, 271 Ill. App. 3d 604, 616 (1995).

¶ 25    Throughout the proceedings, the trial court emphasized that it found Mojica credible and defendant not credible. The court also repeatedly indicated that the State had proved defendant's guilt beyond a reasonable doubt, and it highlighted the facts that lead to this conclusion. Although the court sympathized with defendant's desire for rest so he could continue working hard, the court noted that defendant's desire to do so did not justify harming Mojica.

¶ 26    After denying the posttrial motion, the trial court said "[it] could very likely be wrong," but that was in the context of reminding defendant that he could appeal his conviction. The court then insisted that, in its view, it was not wrong, reiterating yet again that Mojica was credible and defendant was not. When we consider this sequence, we believe that the court, when it stated that "[it] could very likely be wrong" and then mentioned the appeal process, was not indicating reasonable doubt that it was wrong but, rather, that defendant could appeal, and this court might reverse his conviction. Indeed, if the court had found that defendant was not proved guilty beyond a reasonable doubt, it would have granted the posttrial motion. The totality of the court's

statements and the denial of the posttrial motion confirm the court's finding of defendant's guilt beyond a reasonable doubt.

¶ 27    *Weston* is instructive on this point. There, the court, in finding the defendants guilty, considered the " 'totality' " of all of the evidence, including an eyewitness' testimony that the court found " 'clear and convincing' ' *Id.* at 609, 615. On appeal, the defendants argued that this statement confirmed that the court incorrectly applied a clear-and-convincing standard in finding them guilty rather than a beyond-a-reasonable-doubt standard. *Id.* at 614. The appellate court noted that, not only did the trial court not have to state the standard of proof it applied, but the trial court is presumed to have applied the correct law absent some affirmative evidence rebutting that presumption. *Id.* at 615. The appellate court determined that "[t]he presumption that the [trial] court knows the law is not so easily rebutted in this case by one isolated statement, especially where the court demonstrated excellent knowledge of law and facts throughout trial." *Id.* at 616.

¶ 28    Like in *Weston*, the presumption that the court here knew the law and properly applied it is not rebutted by the isolated statement that the court "could very likely be wrong." *Id.* As noted above, the court demonstrated throughout the proceedings that it was well aware of the correct standard of proof and properly applied that standard to the facts presented.

¶ 29                                      III. CONCLUSION

¶ 30    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 31    Affirmed.